UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

GEORGETTE C. JAMES        :    Case No.

               Plaintiff,   :

       vs.                 :

                     :    COMPLAINT

THE INTERPUBLIC GROUP    :

OF COMPANIES, INC. and     :

William Cleary                 :

                     :    Jury Trial Demanded

               Defendants

-----------------------------------------------------x

Plaintiff, Georgette C. James, by and through her attorneys, Egan Law Firm, alleges for her Complaint against Defendants, The Interpublic Group of Companies, Inc. ("IPG") and William Cleary, as follows:

## NATURE OF ACTION

1.      This is an action against Defendant IPG alleging discrimination against Plaintiff on the basis of race in promotion, salary, hostile work environment, and retaliation in violation of Title VII, the Civil Rights Act of 1866, the New York State Human Rights Law, and the New York City Human Rights Law.

## JURISDICTION

2.      The jurisdiction of this Court is invoked pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e-5(f)(3); the Civil Rights Act of 1866, 42 U.S.C. § 1981; 28 U.S.C. §§ 1331 and 1343(3);

and 28 U.S.C. § 1367(a) for claims arising under the New York State Human Rights Law and the New York City Human Rights Law, based on the doctrine of supplemental jurisdiction in that such claims arise from a common nucleus of operative fact and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate.

3.      Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII.  This action is founded on Plaintiff's employment discrimination charges that were timely filed at the United States Equal Employment Opportunity Commission ("EEOC").  A right to sue letter was issued to Plaintiff on her claims.  This lawsuit is commenced within ninety (90) days of receipt by the Plaintiff of her notice of right to sue from the United States Department of Justice.

4.      Venue is properly placed in the Southern District of New York under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) in that a substantial part of the events giving rise to this claim arose in this district and records relevant to the practices complained of herein are located in this district.

## PARTIES

5.      Plaintiff Georgette James is an African American female who resides in New York City.  She is employed now and was during the relevant period by Defendant IPG in its Finance Division.  She received her BA degree in Accounting from the University of Massachusetts and a Masters from Columbia University.  She is

2

a licensed CPA.  Before joining IPG, Plaintiff, a seasoned accounting professional, had 7 years of accounting experience, 4 years as an auditor with a top tier "Big 4" CPA firm and 3 years as an Assistant Vice President in controllers' accounting departments at two financial services companies.

6.      Defendant IPG is one of the "big 4" global advertising holding companies.  The holding company is located in New York and is the "parent' company of public relations, marketing and advertising subsidiaries providing such services the world over.  At its headquarters, IPG employs approximately 700 people in the Controller's Group and 1,300 people in the Finance Division.

7.      William Cleary ("Cleary") is employed by Defendant IPG.  During most of the relevant period, he served as Plaintiff's direct supervisor.

## FACTUAL ALLEGATIONS

**A.      Company Wide Policies Favor Caucasians over African Americans**

8.      Within the Finance Division at IPG headquarters, African Americans are rarely promoted and when they are, they are promoted at a significantly slower rate than comparably situated Caucasian employees.  Above a certain management level, African Americans are hardly promoted at all.

9.      Plaintiff was hired by IPG in the role of Manager within the Financial Reporting Team in the Controller's Group of the Finance Division.  The Financial

Reporting Team was one of several teams at IPG dedicated to reporting on the consolidated business of its subsidiaries.

10.     Positions in the Finance Division ordered from lowest to highest are: Staff Accountant, Senior Accountant, Manager, Senior Manager, Associate Director, Director, Senior Director, and Executive Director.  Positions above the Manager level are rarely, if ever, posted on IPG internal job site.  During the relevant period, in IPG's Finance Division, managerial promotions are routinely filled without posting or announcement.

11.     The Finance Division, which has approximately 1,300 employees, is managed by the Chief Financial Officer of IPG.  The Controller's Group, consisting of approximately 700 employees, is managed by the Controller/Chief Accounting Officer who reports directly to the Chief Financial Officer.

12.     IPG does not have a process by which employees may apply for vacant positions.  There are no policies in place for identifying positions that are open, for applying for such vacancies or for evaluating persons who interview for these positions.  Even the qualifications the Financial Division requires of candidates for openings are not disclosed in any formal way.

13.     Often, the first time employees find out that a position was vacant or available is when IPG informs them that someone has been given the job. Management, *sua sponte*, promotes those it wants to promote into positions as they are created or become available.

4

14.     From 2005 until March 2013, when, for the second time, Plaintiff complained to the new HR Director about race discrimination, a total of approximately 55 professionals had worked in the Financial Reporting/External Reporting Teams that fall under the Controllers Group at the NYC Headquarters building, of which 7 were African American.  Of this group of 55 people, 28 of them have been promoted at least once.  Only 2 of the 28 who were promoted were African American.

15.     During those eight years, the two African Americans that were promoted waited more than twice as long as Caucasians to be promoted.

16.     Professional employees with the Finance Division are evaluated on an annual basis by their supervisors and goals are identified for each employee for the following year.

17.     In evaluations, a supervisor describes in writing whether the employee has accomplished the goals set out for him/her during the preceding year and gives the employee a rating of from one to five which allegedly compares employee's performance during the year against "expectations".  A performance rating of "3" meets expectations.  A performance rating of "5" exceeds expectations in all responsibilities.

18.     IPG provides its supervisors with no guidance on what meeting or exceeding expectations entails.

19.     Further, IPG has no system in place and no effort is made to determine whether the performance grades given by different supervisors are comparable. One supervisor may regard a certain performance as meeting expectations. Another supervisor might assess the same performance as exceeding expectations. Plaintiff received a performance grade of 3 throughout her time at IPG though the description of the performance accompanying the grade ranged from enthusiastic to poor, depending upon whether it was before or after Plaintiff complained to HR about the lack of promotion opportunities for African Americans.

20.     At IPG, the grading system is entirely arbitrary.

21.     The randomness in the evaluation system results in racially defined inconsistencies in the promotions.  The percentage of Caucasian receiving promotions is higher than for African Americans.  The percentage of African Americans fired or accused of having "performance issues" in their evaluations is also higher than the percent for Caucasians.  This keeps African Americans in lower-level positions.

22.     The randomness in the evaluation system results in racially defined inconsistencies in the speed with which personnel are promoted.  Caucasians are promoted much more quickly than comparably situated African Americans.

23.     The randomness in the evaluation system is reflected in racially defined inconsistencies in the levels through which an employee is promoted.  Caucasian employees receive "double" promotions through two levels in the Financial Division,

6

from, for instance, manager through senior manager to associate director.  African Americans do not receive such "double" promotions.

24.     The randomness in the evaluation system is reflected in racially defined inconsistencies in advancement opportunities when personnel switch departments. The majority of Caucasian employees who switch groups are offered a higher level position in their new group.  Comparably situated African Americans, including Plaintiff, are not offered a higher level position in the group to which they are transferring.

25.     Though IPG knows that its evaluation system produces these results, it has failed to take any action to correct the system or examine the results.

26.     Nevertheless, at IPG, when a vacancy is filled from within the Financial Division, a "good" performance evaluation is an essential pre-requisite to being considered for a promotion.

27.     One aspect of obtaining a "good" evaluation is completing the goals identified the during the prior year's evaluation.  However, supervisors are free to change the goals to accommodate changes in priority or for any reason.  There is no system in place and no effort is made to determine if a failure to meet a goal noted in an evaluation is the responsibility of the supervisor or the employee.

28.     Bonuses and salary increases also depend in part upon evaluations.  In the Financial Division, those with lower performance ratings will receive lower salary

increases and bonuses than those with higher performance ratings.  In the Financial Division, there is no system in place and no effort is made to determine whether the amount of compensation paid fairly reflects employees' comparative performance.

29.    The result is a cumulative disparity in compensation between African Americans and Caucasians, with African Americans receiving less compensation than comparably situated Caucasians.

30.    At IPG, as a result of the foregoing policies and practices, there are currently no African Americans above the Manager level in the 700 person Controller's Group.

31.    As a result of the foregoing policies and practices, African American employees are paid less than comparably situated Caucasians.

32.    As of February 2015, only two African Americans held positions above the manager level in the larger Financial Division of 1,300 employees.

33.    As of February 2015, out of the approximately 38 persons who occupied the Senior Vice President and above positions, zero were African American.

- Out of the approximately 12 persons who occupied the Executive Director positions, zero were African American.

- Out of the approximately 7 persons who occupied the Senior Director positions, only one was African American.

- Out of the approximately 99 persons who occupied the Director positions, only one was African American.

- Out of the approximately 14 persons who occupied the Associate Director positions, zero were African American.

- Out of the approximately 29 persons who occupied the Senior Manager positions, zero were African American.

34.     Since Plaintiff joined IPG in 2005, she has not been promoted above the level of manager, the position into which she was hired by IPG.

**B.     Plaintiff's Experience**

35.     Plaintiff was hired by IPG into a newly created manager position in the Financial Reporting Team, a part of the Controllers Group in 2005.

36.     The Financial Reporting Team within the Controllers Group, that is within the Finance Division, is responsible for reporting the consolidated business results of the holding company's subsidiaries and providing guidance and support to each subsidiary's accounting operations and systems.

37.     In the time that Plaintiff has been with the Financial Reporting Team, her responsibilities have included tasks related to (i) advancing various continuous quality improvement initiatives for the Intercompany Process; (ii) advancing the corporate objective of reducing the number of legal entities across the holding company; (iii) reducing the cost/complexity of IPG's legal structure; (iv) Master Data Management (MDM); and (v) other ad hoc projects.

9

38.     During most of the relevant period, the Financial Reporting Team was managed by Defendant Cleary.

39.     During her time with Financial Reporting Team, Plaintiff had been assigned and successfully completed many tasks relating to project/program management of the following processes:

a.     Managing the intercompany process, remediation and monitoring (e.g. material weakness remediation, SP&P policy and FAQ revision and reimplementation, methods and process guidelines creation, book close timeframe reduction, I/C matching tool implementation, ISR form and policy creation for Vantage and Non-Vantage, I/C dividend notification form creation, shared revenue accounting process administration, I/C Loan Project, I/C accounts payable aging project).  For many years, Plaintiff was the lead for this project.

b.     Legal entity simplification and reduction process (e.g. project kickoff, tracking worksheet process, CTA analysis, communication and information process management, country restructuring equity accounting).  For many years, Plaintiff was the lead for this project.

c.     Master Data Management (org data architecture diagram creation for end state systems, tax-related org data update

process creation, daily and monthly master Legal entity

mapping file enhancement, Org Domain Data Mapping Process

review and documentation, co-created MDM Org Domain Data

Elements Governance document, managed entity request and

automation process which is in progress).

    d.    Ad Hoc Projects (annual pro-bono summarization and

presentation).

40.    Two months after she was hired, a Caucasian male was also hired as a

manager.  Both the Plaintiff and the Caucasian male manager directly reported to

the same supervisor.  In 2007, when the unit was reorganized to add a position for

senior manager, the post was given to this Caucasian male rather than to James.

41.    James was qualified for the position of senior manager.

42.    James then reported to this Caucasian manager for the next three

years.  In 2010, he was transferred to another unit within the Controllers Group,

leaving the position of senior manager in Financial Reporting open.  During this

time, James performed the responsibilities that had previously been performed by

the Caucasian male as a senior manager.

43.    In May 2011, a senior accountant of color in Financial Reporting who

reported directly to James for 4 years, left IPG because of IPG's failure to grant him

a requested promotion.  In James' view, this senior accountant was an exemplary

and talented employee to whom James gave consistently high performance ratings in her reviews of him.

44.     In May 2011, James complained to the HR Department about IPG's failure to promote the senior accountant and about the great difficulty people of color had getting promoted at the Finance Division.  She also complained that she believed IPG's failure to promote her and other African Americans was due to race discrimination.

45.     Following this discussion with Human Resources, Plaintiff was foreclosed from further advancement in the Finance Division at IPG and increasingly subjected to a hostile environment, sufficiently severe and pervasive to alter the terms of her employment.

46.     In the June of 2011, Plaintiff asked her supervisor to promote her into the position of Senior Manager vacated by the Caucasian male who had supervised plaintiff almost two years before.  In his absence, his functions were largely performed by Plaintiff.  Cleary refused.

47.     Within a week of her request, the previously vacant position was suddenly filled by another Caucasian male, transferred in from another group within the Controllers Group, who had no background or experience in the work that was being done in Cleary's Financial Reporting Team.

48.     When this employee left IPG two months later after joining Cleary's team, the Plaintiff again asked Cleary to promote her into the senior manager position.

49.     Cleary refused again, claiming this time that his department was being restructured, again, to eliminate the Senior Manager position and to bring in someone new at the manager level.  Cleary hired a Caucasian woman into his newly created Manager position in the Financial Reporting Team, on the same level as Plaintiff, Manager.

50.     Once the Senior Manager post had been eliminated from the Financial Reporting team, Plaintiff asked Cleary to identify opportunities for her for promotion. Cleary said that there were none in his group.

51.     This was not true.  In fact, Cleary had just been promoted to Senior Director and his "team" had doubled in size, leaving ample opportunities for promotion. Over the next few years, Cleary promoted three Caucasians to the level of Senior Manager and above.

52.     Further, at this time, the Financial Reporting Team was integrating Master Data Management into its portfolio of projects.  MDM involves optimizing location, customer, and organization related data to provide better reporting and analytical capabilities to its end users across companywide systems.  As with any new system or process, the opportunity to work with it was essential to one's ability to be promoted within the unit.

13

53.    Instead of assigning Plaintiff tasks which would enable her to familiarize herself with MDM, Cleary urged her to look at two opportunities outside the Controllers Group, in the Vantage Group.

54.    Throughout 2012, Plaintiff was assigned little, if any, MDM work.  Her first assignment with Vantage Group, which was temporary, was completed successfully.  Her second assignment with Vantage Group had the potential of a permanent transfer; however Plaintiff declined the position because it was not at her professional level.

55.    Meanwhile, Cleary started integrating the female Caucasian manager into his group's new MDM project responsibilities.  Cleary also facilitated her integration and visibility into IPG culture by inviting her to the North American Controllers Conference on a consistent basis a year after she started with the firm. This was a professional courtesy not bestowed upon Plaintiff who consistently was not invited to the Controllers' Conference between 2008 and 2012, nor upon Cleary's other African American manager.

56.    When Plaintiff did not accept the permanent transfer outside Financial Reporting Team, and not wishing to include her in the possibilities opened up on the team by MDM or on his expanded team (Corporate Reporting/Executive Compensation) in March 2013, Cleary gave Plaintiff her first poor performance review since joining IPG.  This impaired Plaintiff's ability to be promoted; additionally, it reduced her bonus and merit increase for 2013.

14

57.     Plaintiff complained to the new Human Resources Director that the 2012 performance review was inaccurate and unfair.  She also complained about not being promoted and observed that African Americans had a much more difficult time getting promoted at IPG than Caucasians.

58.     In response, Cleary became increasingly hostile towards Plaintiff.

59.     Each review Cleary prepared for Plaintiff after she complained to HR, including those for 2012, 2013 and 2014, were written with the goal of justifying a) the termination of Plaintiff and/or b) the eventual promotion of the newly hired Caucasian manager over Plaintiff.

60.     Early in 2013, Cleary refused to identify "stretch" objectives, which if accomplished, would indicate a readiness for promotion.  Instead, he assigned her more baseline Manager level objectives than could reasonably be performed in that year.

61.     In addition, Cleary scheduled a mid-year review for Plaintiff in 2013, though Plaintiff had never had a mid-year review before, and though no one else who reported to Cleary received such a review.  The mid-year review given stated that the Plaintiff's performance was poor.

62.     In January 2014, Plaintiff filed a charge with the Equal Employment Opportunity Commission.

63.    Shortly after Plaintiff filed her charge with the EEOC, Plaintiff received her 2013 performance review.  Instead of recognizing that Plaintiff and Cleary had discussed the criticisms identified in the mid-year review or acknowledging that Plaintiff's performance after the mid-year review was in accordance with his specifications, Cleary's 2013 yearend review simply repeated the criticisms he had made at the mid-year review in an effort to make her performance seem poor and to depress her performance rating.

64.    The following year in March 2015, the Plaintiff received a 2014 performance evaluation that not only contained poor commentary on her performance, but also outright lies/false statements.

65.    Over this period, Plaintiff experienced an increasingly hostile work environment.  She was no longer evaluated on the basis of what she actually accomplished; rather on how Cleary wanted it to be perceived.  Her workplace became a miserable, stressful and debilitating environment.  Cleary's conduct was intimidating and harassing and created a hostile environment for Plaintiff.  In addition, the camaraderie formerly present in Plaintiff's and Cleary's professional relationship was gone.

66.    In April 2015, Cleary promoted the female Caucasian manager to the newly created position of Senior Manager in the Financial Reporting Team.

67.    Despite Plaintiff being the lead of two of the three main projects of the Financial Reporting Team for years, despite the Plaintiff managing her sections of

16

the MDM projects, and despite having 10 years of experience in the Team (as compared to the female Caucasian manager's 3.5 years), and despite having more credentials than the other two managers in the group, the female Caucasian manager was promoted over Plaintiff.

68.     Because of Plaintiff's race, she was intentionally given depressed performance reviews and not provided with opportunities to learn new growth areas of the business, allowing IPG to promote Caucasian employees instead.

69.     In addition, Cleary directed Plaintiff to report to the new Senior Manager  rather than to him directly, an action which was effectively a demotion to the Plaintiff.

70.     Another African American Manager in the Financial Reporting Team for longer than the new Senior Manager was also passed over for the promotion. This action was effectively a demotion for the other African American Manager as well.

71.     In April 2015, the Plaintiff submitted an amended charge to the EEOC for the retaliatory and continuing discriminatory acts executed against Plaintiff by Defendants.

72.     Since the promotion of the new Senior Manager, Cleary's interaction with Plaintiff has been minimal.  In creating objectives for 2015, Cleary did not

approve Plaintiff's 2015 objectives until August 2015.  This sent a clear message to the Plaintiff that her supervisor has no interest in the Plaintiff's career growth at IPG.

**73.**     The conduct of Defendants was willful and malicious, and represented a reckless disregard of (1) their obligations under the federal, state and city statutes under which this action is brought and (2) of the risk of damaging plaintiff.

<u>**CAUSES OF ACTION**</u>

**FIRST CLAIM FOR RELIEF**

**Intentional Discrimination based on Race under**
**Title VII (42 U.S.C. §2000e) and 42 U.S.C. § 1981,**
**NYSHRL, NY Executive Law § 296 et seq and**
**NYCHRL, NYC Administrative Code § 8-107 et seq**

**74.**     Plaintiff hereby repeats and realleges each allegation set forth above as if fully set forth herein.

**75.**     In the ten years that Plaintiff has been employed with IPG, IPG has intentionally discriminated against Plaintiff, based on her race by failing to promote her into vacancies for which she was qualified; and by compensating at a rate less than comparably situated Caucasian employees.

**76.**     IPG has perpetrated such discrimination through a company wide pattern and practice of discrimination against its African American employees, including Plaintiff, which has resulted in disproportionately few African Americans being promoted above the level of manager.

18

77.     IPG has intentionally discriminated against Plaintiff, in violation of Title VII by:

- Delegating unchecked and standardless discretion to Caucasian supervisors in (i) the allocation of business and professional support; (ii) the performance reviews of their subordinates; (iii) the decisions regarding employees' compensation; and (iv) the selection of individuals for promotion.

- Fostering a corporate culture which (i) excludes African Americans, (ii) under-values their aptitude and performance and (iii) discounts their professional contributions.

- Failing and refusing to take reasonable and adequate steps to prevent and correct instances of discrimination.

78.     These policies were intended and had the effect of:

- Denying Plaintiff promotions because of her race.

- Compensating Plaintiff less because of her race.

- Evaluating her performance more negatively because of her race.

- Denying Plaintiff business opportunities because of her race.

- Offering her less administrative support, training and mentorship because of her race.

- Providing her with inferior terms and conditions of employment because of her race.

79.     As a direct result of IPG's discriminatory policies and practices, Plaintiff has suffered damages, including: (i) lost past and future income; (ii) compensation and benefits; (iii) interference with professional progress; (iv) diminishment of professional status; and (v) humiliation and other pain and suffering.

80.     The foregoing constitutes illegal and intentional discrimination, as well as unjustified disparate treatment, in violation of 42 U.S.C. §§ 2000e et seq and 42 U.S.C. § 1981, NY Executive Law § 296 et seq and NY Administrative Code § 8-107 et seq.

## SECOND CLAIM FOR RELIEF

**Disparate Impact Discrimination based on Race under
Title VII (42 U.S.C. §2000e) and 42 U.S.C. § 1981,
NYSHRL, NY Executive Law § 296 et seq and
NYCHRL, NYC Administrative Code § 8-107 et seq**

81.     Plaintiff hereby repeats and realleges each allegation set forth above as if fully set forth herein.

82.     IPG's delegation of unchecked and standardless discretion to its overwhelmingly Caucasian supervisors to (i) distribute business opportunities, (ii) determine levels of professional support, (iii) evaluate employee performance, (iv) set compensation, (v) select individuals for promotion, and (vi) determine other terms and conditions of employment has an adverse impact on African American professional employees, including Plaintiff, who seek advancement.  It is in violation of Title VII and § 1981, and is not and cannot be justified by business necessity.

83.     Were such system or policies justifiable by business necessity, it would still be the case that less discriminatory alternatives are available, and would equally serve any alleged necessity.

84.     IPG has maintained these discriminatory policies, patterns and practices both within and outside the liability period.

85.     As a direct result of IPG's discriminatory policies and practices, Plaintiff has suffered damages, including (i) lost past and future income, (ii) compensation and benefits, (iii) interference with professional progress, (iv) diminishment of professional status; and (v) humiliation and other pain and suffering.

86.     The foregoing policies, practices and patterns have an unlawful disparate impact to African American employees, including Plaintiff, in violation of 42 U.S.C §§2000e et seq and 42 U.S.C § 1981, NYSHRL, NY Executive Law § 296 et seq and NYCHRL, NYC Administrative Code § 8-107 et seq.

### THIRD CLAIM FOR RELIEF

### Retaliation

**Title VII (42 U.S.C. §2000e) and 42 U.S.C. § 1981
NYSHRL, NY Executive Law § 296 et seq and
NYCHRL, NYC Administrative Code § 8-107 et seq**

87.     Plaintiff hereby repeats and realleges each allegation set forth above as if fully set forth herein.

88.     Plaintiff engaged in protected activities, which included making complaints about race discrimination and IPG's discriminatory policies and practices to IPG and filing charges with the EEOC.

89.     IPG took adverse actions against Plaintiff with the purpose of retaliating against her because of her participation in protected activities.

90.     As a direct result of IPG's adverse actions, Plaintiff has suffered damages which include (i) lost past and future income, compensation and benefits, (ii) interference with professional progress, (iii) diminishment of professional status; and (iv) humiliation and other pain and suffering.

**FOURTH CLAIM FOR RELIEF**

**Hostile Work Environment under**
**Title VII (42 U.S.C. §2000e) and 42 U.S.C. § 1981,**
**NYSHRL, NY Executive Law § 296 et seq and**
**NYCHRL, NYC Administrative Code § 8-107 et seq**

91.     Plaintiff hereby repeats and realleges each allegation set forth above as if fully set forth herein.

92.     From the time that Plaintiff first complained to the Human Resources department that the failure to promote African Americans was due to race, Plaintiff has been subjected to an increasingly hostile environment by Cleary with the knowledge and encouragement of management and Human Resources.

93.     Plaintiff's work environment was permeated with racially discriminatory intimidation, ridicule, and insult, sufficiently severe and pervasive to alter the conditions of employment and create an abusive working environment.

94.     As a direct result of said hostile environment, Plaintiff has suffered damages that include (i) lost past and future income, compensation and benefits;

(ii) interference with professional progress; (iii) diminishment of professional status; and (iv) humiliation and other pain and suffering.

## FIFTH CLAIM FOR RELIEF

## AGAINST CLEARY FOR AIDING AND ABETTING

### Violations of NYSHRL, NY Executive Law § 290 and NYCHRL, NYC Administrative Code § 8-107 et seq

95.     Plaintiff hereby repeats and realleges each allegation set forth above as if fully set forth herein.

96.     At all relevant times, Cleary supervised Plaintiff while Defendant IPG engaged in the discriminatory policies and practices against Plaintiff described hereinabove.

97.     Acting in consultation with IPG and its Human Resources Department, Cleary condoned, encouraged and effectuated the policies and practices described against Plaintiff.

98.     Cleary aided and abetted IPG in discriminating against Plaintiff.

99.     As a direct result of Cleary's conduct, Plaintiff has suffered damages including (i) lost past and future income, compensation and benefits; (ii) interference with professional progress; (iii) diminishment of professional status; and (iv) humiliation and other pain and suffering.

100.    Such conduct is a violation of the NYSHRL, NY Executive Law § 290(6) and NYCHRL, NY Administrative Code § 8-107.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

- Enter judgment declaring that the acts and practices of Defendants described above are in violation of the laws of the United States and the State and City of New York;

- Order that Defendants immediately reimburse, and make whole Plaintiff for any and all benefits to which she would have been entitled had it not been for Defendants' illegal actions including, but not limited to, lost past and future income, compensation and benefits;

- Award compensatory damages for the pain, suffering, emotional distress, loss of dignity, humiliation, and damages to reputation and profession endured by Plaintiff in amounts that are fair, just and reasonable, to be determined at trial;

- Award Plaintiff punitive damages in an amount to be determined at trial;

- Award Plaintiff all costs of this action and reasonable attorneys' fees, as provided for in 42 USC §1988 and 42 USC §2000e-5(k); and NYC Administrative Code 8-10.

- Grant Plaintiff such other and further relief as the Court deems appropriate and equitable,

PLAINTIFF DEMANDS TRIAL BY JURY

Dated:    October 14, 2015
          New York, New York

                              Respectfully Submitted,
                              EGAN LAW FIRM


                              _____
                              By Susan B Egan
                              Attorneys for Plaintiff
                              805 Third Avenue
                              New York, NY 10022
                              212 619 8456
                              segan@eganattorneys.com